UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| N.N.,<br><br>        Plaintiff,<br><br>    v.<br><br>KILOLO KIJAKAZI,<br><br>        Defendant. | Case No. 19-cv-04682-VKD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 18, 22 |

Plaintiff N.N.[1] appeals a final decision of the Commissioner of Social Security ("Commissioner")[2] denying her application for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, *et seq*. The essential question on appeal is whether the administrative law judge ("ALJ") properly evaluated the medical evidence and N.N.'s subjective testimony regarding her symptoms in assessing N.N.'s residual functional capacity ("RFC"), such that the ALJ's conclusion that N.N. is capable of working and is not disabled is correct and should be affirmed. Even assuming that the ALJ's RFC determination is supported by substantial evidence, N.N. contends that the ALJ erred in finding that she could perform her past relevant work as generally performed.

---

[1] Because opinions by the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by her initials. This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi, Acting Commissioner of Social Security, is substituted as defendant in place of Andrew Saul.

The parties have filed cross-motions for summary judgment. The matter was submitted without oral argument. Upon consideration of the moving and responding papers and the relevant evidence of record, for the reasons set forth below, the Court grants in part and denies in part N.N.'s motion for summary judgment, grants in part and denies in part the Commissioner's cross-motion for summary judgment, and remands this matter for further administrative proceedings consistent with this opinion.[3]

## I. BACKGROUND

N.N. filed her application for disability insurance benefits in February 2015, when she was 60 years old, alleging that she has been disabled beginning May 15, 2007 due to congenital spinal stenosis, spondylolisthesis, nerve compression, arthritis, spurs on vertebrae and a flat spine (no curvature). AR[4] 64, 204, 206, 217. N.N. subsequently amended her alleged onset date of disability to June 1, 2004. *See* AR 60.

N.N. has a master's degree in art. AR 65, 78. Her most recent work history includes about fourteen years of jobs and promotions at the YMCA from 1990-2004, where she last worked as an administrative services director/manager. *See* AR 219, 248.

N.N.'s application was denied initially and on review. An ALJ held a hearing and subsequently issued an unfavorable decision on May 31, 2018. AR 16-26. The ALJ found that N.N. meets the insured status requirements of the Act through December 31, 2009 and that she has not engaged in substantial gainful activity since the alleged onset date of June 1, 2004 through her date last insured. AR 18. She further found that N.N. has the following severe impairments: "degenerative disc disease of the cervical and lumbar spine, status-post cervical and lumbar fusion procedures in 2004, and additional lumbar fusion in 2006; right carpal tunnel syndrome; and right patellofemoral syndrome." AR 19. However, the ALJ concluded that N.N. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in the Commissioner's regulations. AR 21. Additionally, the ALJ found

---

[3] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 9, 10.

[4] "AR" refers to the certified administrative record lodged with the Court. Dkt. No. 15.

that N.N.'s medically determinable mental impairments of depression and anxiety, considered singly and in combination, did not cause more than minimal limitation in her ability to perform basic mental work activities and therefore were nonsevere. AR 19-20.

The ALJ determined that N.N. has the RFC to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), except as follows:

> [N.N.] could not climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs. She could occasionally balance, stoop, kneel, crouch, and crawl. She had to avoid concentrated exposure to hazards such as unprotected heights and moving machinery. She required the option to alternate between sitting and standing approximately every 30 minutes.

AR 21. The ALJ found that through the December 31, 2009 date last insured, N.N. was capable of performing past relevant work as an administrative assistant and that such work did not require the performance of work-related activities preluded by N.N.'s RFC. AR 25. Accordingly, the ALJ concluded that N.N. was not disabled, as defined by the Act, from the alleged onset date of June 1, 2004 through December 31, 2009. AR 26.

The Appeals Council denied N.N.'s request for review of the ALJ's decision. AR 1-3. N.N. then filed the present action seeking judicial review of the decision denying her application for benefits.

## II.  LEGAL STANDARD

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance" and is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ahearn*, 988 F.3d at 1115 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)); *see also Morgan*, 169 F.3d at 599 (same). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as

1  supporting evidence. *Ahearn*, 988 F.3d at 1115; *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir.
2  1989). Where evidence exists to support more than one rational interpretation, the Court must
3  defer to the decision of the Commissioner. *Ahearn*, 988 F.3d at 1115-16; *Morgan*, 169 F.3d at
4  599.

**III.   DISCUSSION**

N.N. contends that the ALJ's RFC assessment is not supported by substantial evidence for several reasons. First, N.N. argues that although the ALJ found her carpal tunnel syndrome to be a severe impairment, the ALJ erred in failing to find any functional limitations based on that impairment. Second, N.N. argues that the ALJ did not properly evaluate the medical evidence concerning her spine surgeries, which N.N. says demonstrates at least one or two periods of disability prior to December 31, 2009 that should have resulted in an assessment of disability extending beyond December 31, 2009. Third, N.N. contends that the ALJ improperly discounted her statements and testimony regarding her symptoms.

**A.    Carpal Tunnel Syndrome**

Although N.N. does not challenge the ALJ's finding at step 2 of the sequential analysis that her carpal tunnel syndrome is a severe impairment, N.N. argues that the ALJ erred by failing to find that she has any right-hand limitations. "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8P (S.S.A.), 1996 WL 374184 at *5; *see also* 20 C.F.R. § 404.1545(a)(2) (stating that when a claimant has more than one impairment, "[w]e will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."). Thus the law is clear that an ALJ cannot simply ignore a claimant's impairments, whether severe or not severe, in assessing RFC.

The law is somewhat less clear about the specific issue that the parties dispute: whether an ALJ must not only consider a severe impairment, but must also affirmatively incorporate a limitation based on such an impairment in assessing a claimant's RFC. On this point, the parties' briefs are not helpful. The Commissioner does not cite authority directly addressing the issue.

4

1  Plaintiff failed to cite any law at all.

2  In *Osenbrock v. Apfel*, 240 F.3d 1157 (9th Cir. 2001), cited by the Commissioner, the Ninth Circuit found no error where the ALJ omitted limitations from a hypothetical question to the vocational expert where there was no evidence that the limitations were severe enough to interfere with claimant's ability to work. *Id*. at 1164-65.  The Commissioner correctly notes that *Osenbrock* also acknowledges that "[a]n ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." *Id*. at 1165.  In *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155 (9th Cir. 2008), the Ninth Circuit concluded that the ALJ erred by failing to include a limitation for the claimant's tendonitis in the RFC assessment where a treating physician opined that the claimant's tendonitis significantly limited rotary function. *Id*. at 1164.  More recently, district courts within the Ninth Circuit have held that an ALJ cannot simply ignore a severe impairment or fail to account for any limitations based on such an impairment, at least not without explaining why those impairments do not give rise to additional limitations in a claimant's RFC. *See, e.g., Nichols v. Berryhill*, No. CV 16-71-BLG-SPW, 2018 WL 1254999, at *7 (D. Mont. Mar. 12, 2018) (concluding that "the ALJ was required to either address the effects of Plaintiff's [severe impairments] or explain why they gave rise to no additional limitations."); *Hassan v. Colvin*, No. 12-cv-05821-RS, 2015 WL 2358023, at *2 (N.D. Cal. May 15, 2015) ("[W]hile the Commissioner may be correct that a finding of a severe impairment does not presumptively lead to any particular work limitation, neither can it simply be ignored without explanation.").

Here, the record presents a situation where the ALJ found that N.N.'s carpal tunnel syndrome was "severe," signifying that the ALJ found that the condition "significantly limits [N.N.'s] physical . . . ability to do basic work activities," *see* AR 17; 20 C.F.R. § 404.1520(c), but nonetheless ultimately concluded that N.N.'s carpal tunnel syndrome did not give rise to limitations that preclude N.N.'s ability to work.  The ALJ explained that she reached that conclusion because N.N.'s carpal tunnel pain responded well to conservative treatment, and her explanation is supported by substantial evidence.  The ALJ acknowledged that a May 2005 nerve conduction study "revealed mild right median neuropathy at the wrist consistent with carpal tunnel

5

syndrome." AR 22, 446.  The ALJ correctly noted that a January 2009 examination indicated that carpal tunnel syndrome did not affect N.N.'s grip strength, the sensation in her upper extremity or the range of motion in her wrist (AR 23, 1113, 1123); for most of the relevant period, N.N.'s carpal tunnel syndrome was treated conservatively with wrist splints and physical therapy (AR 23, 1100, 1112); and the most invasive treatment N.N. received was a cortisone shot in January 2009, after which N.N. reported that the shot was helpful and that her hand and wrist were "doing well" (AR 23, 1123, 1128, 1134).  The ALJ also correctly observed that N.N. did not seek surgery for carpal tunnel syndrome until February 2011, over a year after her date last insured.  AR 23, 1812-13, 1845, 1872-73.  N.N. does not point to specific evidence indicating that her carpal tunnel symptoms resulted in functional limitations or to any specific error by the ALJ in considering the evidence regarding her manipulative abilities.  The Court finds no error here.

### B. Periods of Disability

As discussed above, the ALJ determined that N.N. was not disabled from the June 1, 2004 alleged onset of disability through the December 31, 2009 date last insured.  In so finding, the ALJ noted that N.N. did not file her claim for disability benefits until February 2015, more than five years after her insured status expired and more than 10 years after the alleged onset date.  AR 22.  N.N. argues that the ALJ should have applied a so-called disability "freeze" to essentially extend her date last insured and evaluate disability beyond December 31, 2009.  N.N. contends that the evidence demonstrates that she experienced periods of disability between 2004 and 2006 due to three spine surgeries, which N.N. says would extend her date last insured through mid-2011 or late 2012, thereby expanding the scope of evidence to be considered in the RFC assessment.

To establish disability under the Act, an individual must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that can be expected to result in death or has lasted or can be expected to last for at least twelve continuous months.  42 U.S.C. § 423(d)(1)(A).  Such disability must be established on or before the claimant's date last insured.  *Id*. § 423(c); *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995).

A period of disability begins on the day the disability began, but only if the claimant is

6

fully insured at that time. 42 U.S.C. §§ 416(i)(2)(C), 416(i)(3)(A); 20 C.F.R. § 404.131; *see also Sprow v. Bowen*, 865 F.2d 207, 208 (9th Cir.1989) ("The phrase 'period of disability' as used in the regulation and controlling statutes is, however, a term of art. It does not mean simply a period during which a person is disabled and not working. The person must, in addition, be insured."). To have disability insured status, a claimant must be fully insured and have at least 20 quarters of coverage during the preceding 40 quarters. 20 C.F.R. § 404.130(b). To receive disability benefits, an individual must file an application for disability either while the period of disability continues or within 12 months of the end of the period of disability. 42 U.S.C. § 416(i)(2)(B); 20 C.F.R. §§ 404.320(b)(3), 404.603. Disability benefits cease when the period of disability ends for reasons such as medical improvement and the individual is again able to engage in substantial gainful activity. 42 U.S.C. § 423(f); 20 C.F.R. §§ 404.321, 404.325, 404.1545(a), 404.1571. "The statutory schema thus requires that a disability be continuously disabling from the time of onset during insured status to the time of application for benefits, if an individual applies for benefits for a current disability after the expiration of insured status." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1460 (9th Cir.1995).

"Establishment of a period of disability also allows an individual to exclude that time from the number of years for which quarters of coverage are required, making it easier for an individual to satisfy the insured status requirement for a second period of disability at a later time." *Id.* (citing *Sprow*, 865 F.2d at 209); *see also* 20 C.F.R. § 404.320(a) ("If we establish a period of disability for you, the months in that period of time will not be counted in figuring your average earnings. If benefits payable on your earnings record would be denied or reduced because of a period of disability, the period of disability will not be taken into consideration."). "The regulation speaks to applicants who apply too late to receive benefits for the period of disability, but who nevertheless wish to have the years in the period of disability excluded from the number of years for which quarters of coverage are required." *Sprow*, 865 F.2d at 209. Thus, with respect to N.N., the primary issue is whether the ALJ should have found that she was disabled for a period of time between 2004 and 2006 due to her spine surgeries.

Arguing that the surgeries did not completely resolve her pain symptoms and that the

1  attendant recovery periods were slow, N.N. contends that the evidence establishes periods of

2  disability from September 2003 or January 2004 through at least the April 8, 2004 date of her

3  cervical spine surgery and from September 2004 through at least July 2006, during which time she

4  had two lumbar spine surgeries. Relatedly, N.N. argues that the ALJ erred in giving little weight

5  to records in which her surgeon, Dr. Ravinder Bains, M.D., noted that N.N. was unable to work

6  for various periods, including from the alleged onset of disability in June 2004 to August 2005.

7        The ALJ considered N.N.'s three spine surgeries between 2004 and 2006, including the

8  April 2004 cervical spine decompression and fusion at the C4-C7 levels (with a medical history of

9  a prior cervical fusion surgery at the C5-C6 level ten years earlier); followed by an October 2004

10  lumbar decompression and fusion surgery at the L4-L5 level due to stenosis and spondylolisthesis,

11  causing low back pain and leg pain; and a July 2006 anterior bilateral L5 nerve root

12  decompression and fusion, which Dr. Bains determined was indicated after selective nerve root

13  blocks to address N.N.'s complaints of mild radiculopathy and intermittent back pain provided

14  tremendous pain relief, but only for a week or two. AR 22, 374, 400, 430, 493, 519, 531-532,

15  551-552, 605-606, 2589-2594.

16        **1.**    **Cervical Spine Surgery**

17        N.N. contends that the record demonstrates a period of disability due to her cervical spine

18  issues from September 2003 or January 2004 through the April 8, 2004 surgery date, or through at

19  least July 2005 for "an assumed normal post-surgical recovery time" and ongoing pain. Dkt. No.

20  18 at 6. The ALJ found that N.N.'s neck pain responded well to the April 2004 surgery, stating

21  that "[a]lthough [N.N.] subsequently complained of intermittent neck pain, there is no evidence of

22  extreme limitations associated with it." AR 23. The ALJ's findings are supported by substantial

23  evidence.

24        A July 8, 2004 follow-up note by Dr. Bains states that N.N. reported that her overall neck

25  and arm pain relief "is approximately 50 percent." AR 2022. And as noted by the ALJ, in an

26  August 12, 2004 report, Dr. Bains indicated that N.N.'s recovery was progressing, stating that she

27  "has done remarkably well" with her cervical fusion. AR 23, 2025. N.N. points out that 10

28  months after her surgery, a February 3, 2005 progress note shows that she was experiencing some

irritating neck muscle tightness on her right side. AR 374, 2053. The ALJ took N.N.'s post-surgery complaints of neck pain into account, noting that follow-up records from March 2005 and May 2005 show that N.N. continued to complain of neck pain. AR 22, 400, 430; *see also* AR 2059. N.N. emphasizes that the May 2005 note states that she was "slowly improving" (AR 430, 2059), but she points to no specific medical evidence to support that she was unable to perform any work due to neck pain through July 2005. The ALJ noted that subsequent records, including an April 2007 encounter for palpitation issues and a February 6, 2009 note re carpal tunnel complaints, noted no neck abnormalities. AR 23, 836, 1134. And a January 2009 report concerning N.N.'s carpal tunnel symptoms states that N.N. reported that her "[n]eck pain is much better since last surgery" and that she "works on [a] computer." AR 1112. Insofar as N.N. contends that the ALJ should have found that she was disabled due to her cervical spine issues, her motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

### 2. Lumbar Spine Surgeries

N.N. nonetheless argues that records concerning her lumbar spine surgeries support a period of disability from at least September 2004 through at least July 2006. Dkt. No. 18 at 6. Following N.N.'s October 2004 lumbar surgery, the ALJ noted that N.N.'s back pain and leg pain improved, though she continued to have some back pain and mild radiculopathy. The ALJ found that while N.N. "did experience persistent lumbar pain, it was medically managed, it did not affect her gait or strength, and it did not prevent her from accomplishing her life activities, which included regularly flying to San Diego to care for an elderly relative." AR 24. The ALJ's findings are supported by substantial evidence.

A February 3, 2005 follow-up note indicates that N.N. reported "some low back sacral area strain/pain" that she attributed to "healing and muscle healing," but did "not have the same pain she had prior to surgery which went from her hips down to her knees." AR 22, 374. In a May 5, 2005 follow-up appointment, Dr. Bains noted that N.N. was "slowly improving," and that she reported "[h]er back pain is about 30-40% better and her leg pain is about 70% better." AR 22, 430. A November 23, 2005 progress note documents N.N.'s continued complaints of mild

9

1  radiculopathy, and Dr. Bains ordered a selective nerve root block, noting that "these symptoms are
2  intermittent and do[] not reflect the intensity of pain [N.N.] experienced prior to her lumbar
3  surgery."  AR 22, 493.  Dr. Bains noted the need to follow up and that a further surgery might be
4  indicated.  AR 493.  In May 2006, Dr. Bains recommended another lumbar surgery (conducted in
5  July 2006), noting that N.N. experienced worsening pain and that selective nerve root blocks had
6  provided tremendous, but temporary, pain relief.  AR 22, 531-32, 551-52, 605-06.

   As noted by the ALJ, following the July 2006 lumbar surgery, records indicate that N.N.
8  reported ongoing lumbar pain through the December 31, 2009 date last insured and that she took
9  pain medication, was referred to physical therapy, and received lumbar epidural steroid injections
10 in October 2006 and December 2009.  AR 23, 695, 717, 986, 1089, 1329, 1338, 1348, 1359, 1447,
11 1460, 1481-1482.  As noted above, while acknowledging that N.N. experienced persistent lumbar
12 pain, the ALJ found that the pain "was medically managed, it did not affect her gait or strength,
13 and it did not prevent her from accomplishing her life activities, which included regularly flying to
14 San Diego to care for an elderly relative."  AR 24.  The ALJ's findings are supported by
15 substantial evidence.  Here, the ALJ notes that examination records from before and after N.N.'s
16 July 2006 surgery show normal gait, strength and musculoskeletal range of motion; and that
17 imaging studies in 2009 show that the spine fusions remained stable, "minimal" spondylolisthesis
18 at L4-5, decreased stenosis and mild degenerative disc disease at L3-4, normal alignment and no
19 instability with lumbar flexion.  AR 24, 374-75, 493, 1044, 1123, 1338, 1342, 1348, 1380-81.
20 N.N. points out that after her October 1, 2006 epidural injection, she reported that she had still not
21 experienced pain relief by the next day.  AR 23, 717, 2135.  She also notes that by May 2007
22 (about 9 months after her second surgery), her pain was still not completely resolved.  AR 2096.
23 Nonetheless, that May 2007 record also indicates that she reported her pain was 90% better, that
24 she was taking less pain mediation, and that Dr. Bains concluded she could be discharged from the
25 spine clinic at that time.  *Id*.

26  The ALJ correctly noted that other records from 2008 and 2009 show that N.N. regularly
27 traveled to San Diego to help with care for her parents.  AR 23, 986,1018, 1089, 1127, 1660.
28 Additional records from October 2009 show that N.N. complained of low back pain radiating to

1  the legs for the past 3-4 weeks, and her physician prescribed a course of steroids and then
2  ibuprofen. Although the ALJ glosses over the steroid prescription, she correctly notes that N.N.
3  reported the steroids and ibuprofen helped her pain. AR 24, 1348-49 1391, 1396. N.N. later
4  reported a return of the same pain after a friend came up from behind N.N. and picked her up. AR
5  1405. N.N.'s physician administered an epidural injection in December 2009, and N.N. reported
6  70-75% pain relief and stated that she planned to limit her exercise to walking, but hoped to
7  increase her activity and return to low-impact aerobic exercises. AR 1474, 1481-82.

Insofar as N.N. contends that the ALJ should have found that she was disabled due to her lumbar spine issues, her motion for summary judgment is denied, and the Commissioner's motion for summary judgment is granted.

### 3. Dr. Bains's Healthcare Certifications

N.N. maintains that the ALJ erred in giving "little weight" to a series of healthcare certifications from Dr. Bains stating that N.N. was unable to work from May 2004 through August 2005 due to her cervical and lumbar spine issues. In May 2004, Dr. Bains initially stated that due to her cervical radiculopathy, N.N. would be unable to work from May 25, 2004 through August 1, 2004, and then later extended that date through September 1, 2004. AR 2014, 2017, 2019-20. In August 2004, Dr. Bains indicated that N.N. would be unable to work from August 31, 2004 through December 31, 2004, noting her diagnosis of degenerative spondylosis and anticipated October 2004 lumbar surgery. AR 2023-24, 2026-28. In December 2004, Dr. Bains extended N.N.'s expected return to work date to May 1, 2005, and in May 2005 he again extended that date to August 2, 2005 noting N.N.'s October 2004 lumbar surgery and physical therapy treatment plan. AR 2046-47, 2056.

N.N. argues that the ALJ gave Dr. Bains's certifications little weight without giving any particular reason for doing so. To the contrary, as discussed below, the ALJ gave specific reasons for discounting Dr. Bains's certifications. In reply, N.N. additionally argues that the ALJ should have considered "the limits of lesser RFC due to scheduling and recovery times as a separate limit on ability to work in 2004-2006" (Dkt. No. 25 at 3)—an argument that the Court broadly construes to mean that the ALJ did not consider the effect of excessive absenteeism on N.N.'s

11

1    ability to maintain an acceptable work schedule from 2004 through 2006.

2    Noting that disability is a determination reserved for the Commissioner, 20 C.F.R.
§ 404.1527, the ALJ explained that she gave Dr. Bains's certifications little weight because the work restrictions "were intended to be temporary, and were not intended to be an assessment of disability" and are "vague in that they did not describe any specific physical limitations." AR 24. Although the ALJ correctly noted that Dr. Bains's certifications were temporary assessments, N.N.'s present argument is that the ALJ should have found her disabled for at least a more limited period between 2004 and 2006.

Even so, the ALJ correctly noted that Dr. Bains's certifications are vague as to N.N.'s functional limitations. Dr. Bains did not provide any medical opinions, but rather only medical progress notes documenting his treatment of N.N. *See* 20 C.F.R. § 404.1527(a)[5] (defining medical "opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."); *Lowry v. Colvin*, No. 13-cv-03304-NC, 2014 WL 3836224, at *5 (N.D. Cal. July 31, 2014) (physician's treatment notes did not constitute a medical opinion because notes did not contain a subjective assessment of claimant's physical limitations with regard to his ability to perform functional tasks). As noted by the Commissioner, although the certification forms included checkboxes for functional assessments, Dr. Bains did not check any of them. *See* AR 2019, 2023, 2026. The Court finds no error in the ALJ's decision to give little weight to Dr. Bains's certifications.

### 4. Absenteeism

In her reply, N.N. focuses solely on the issue of "scheduling and recovery times" related to her surgeries in 2004 and 2006. As noted above, the Court construes this argument as one that the ALJ failed to consider the effect of potential absenteeism due to N.N.'s several spine surgeries and

---

[5] The Commissioner's rules and regulations regarding the evaluation of medical evidence were revised in March 2017, and those new rules apply to claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1520c. Because N.N.'s claim was filed before March 27, 2017, the Court applies the rules then in effect under 20 C.F.R. § 404.1527.

attendant recovery periods as a limitation in the RFC assessment.  Here, N.N. appears to argue that apart from what the objective evidence shows about her functional abilities between 2004 and 2006, her surgery schedules and recovery periods, in and of themselves, would have prevented her from maintaining any sort of employment.  Courts have observed that "[a]bsenteeism due to the frequency of treatment is a relevant factor so long as the treatment is medically necessary and concerns the conditions on which the disability claim is founded." *Scott G. v. Comm'r of Soc. Sec.*, No. 1:19-cv-01482-DB, 2021 WL 958452, at *4 (W.D.N.Y. Mar. 15, 2021).  Although N.N. fails to point to any evidence regarding what level of absenteeism might be significant, the Court observes that during the administrative hearing, the vocational expert testified that there are no jobs available for a hypothetical individual with a background and limitations consistent with the ALJ's assessed RFC for N.N., and who has the additional limitation of being off-task or absent from work 20% of a work day or work week (i.e., absences of almost two hours per work day or one day per work week).  AR 87.  Additionally, the VE testified that no jobs are available if a hypothetical, similarly situated individual were to miss two days of work per month, as that is not considered full-time competitive employment.  AR. 89.  N.N. does not provide a calculation as to how many days of work she would have missed in the period between 2004 and 2006 due to her three spine surgeries and attendant convalescence and treatment, although the record indicates that she spent a week in the hospital for each of her lumbar spine surgeries and had, on average, 4-5 follow-up visits per year concerning her cervical and lumbar issues.  *See* AR 2016, 2022, 2025, 2041, 2042, 2048, 2050, 2053, 2059, 2061, 2063, 2067, 2076, 2594.  It is possible that N.N.'s medically necessary treatment would have required absences of more than 2 days per month; the Court cannot clearly tell one way or the other.  Inasmuch as the ALJ's decision does not expressly address the extent to which N.N.'s surgery schedule and attendant recovery and treatment might implicate excessive absenteeism for the period of time from the alleged onset of disability from June 1, 2004 through August 1, 2005 period covered by Dr. Bains's certifications, the case will be remanded for that purpose.

### C. N.N.'s Subjective Testimony

N.N. argues that the ALJ erred in failing to credit her consistent work history when she

determined that N.N.'s reports of pain and other symptoms were not entirely credible. An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citing 42 U.S.C. § 423(d)(5)(A)). In assessing a claimant's subjective testimony, an ALJ conducts a two-step analysis. First, "the claimant 'must produce objective medical evidence of an underlying impairment' or impairments that could reasonably be expected to produce some degree of symptom." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (*quoting Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996)). If the claimant does so, and there is no affirmative evidence of malingering, then the ALJ can reject the claimant's testimony as to the severity of the symptoms "'only by offering specific, clear and convincing reasons for doing so.'" *Id*. (*quoting Smolen*, 80 F.3d at 1283-84); *see also Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) ("We therefore review the ALJ's discrediting of Claimant's testimony for specific, clear, and convincing reasons.").

The Ninth Circuit has held that a claimant's work history is among the factors that an ALJ may consider in evaluating testimony, along with the claimant's reputation for truthfulness, inconsistencies in the claimant's testimony, inconsistencies between the claimant's testimony and conduct, the claimant's daily activities, and testimony from physicians and third parties concerning the nature, severity, and effect of the claimant's symptoms. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002); *Rivera v. Berryhill*, No. 16-cv-06927-SVK, 2017 WL 4073956, at *7 (N.D. Cal. Sept. 14, 2017) (stating that "work history is one of many factors the ALJ may consider."). N.N. acknowledges that an ALJ need not discuss every possible factor having some bearing on the issue before making a finding regarding a claimant's testimony. While she may be correct that a good work history may enhance a claimant's credibility, *cf. Thomas*, 278 F.3d at 959 (holding that claimant's "extremely poor work history" shows that she has little propensity to work and negatively affects "her credibility regarding her inability to work"), N.N. has not cited any authority that a good work history necessarily is dispositive.

Here, the ALJ discounted N.N.'s statements and testimony regarding her symptoms and their effect on her functioning, in part because objective medical evidence shows that N.N.'s "neck pain responded very well to surgery"; her carpal tunnel and knee pain "responded well to

14

conservative treatment"; while persistent, her lumbar pain was "medically managed"; and these objective findings are consistent with N.N.'s reports to her physicians. AR 24, 374-75, 430, 493, 766, 692, 695, 1044, 1123, 1338, 1342, 1348, 1380-81, 1391, 1474, 1481-82, 1753. For the reasons discussed above, the ALJ's findings are supported by substantial evidence. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."). Additionally, the ALJ correctly noted that ALJ was able to travel, despite her allegations of disabling pain. AR 23, 986, 1018, 1089, 1112, 1127, 1660. Although N.N.'s work history may support a determination more favorable to N.N., based on the record as a whole, the ALJ's evaluation of her statements and testimony was at least rational. The Court finds no error here.

Because the Court concludes that remand is necessary with respect to the issue of potential excessive absenteeism that may impact N.N.'s RFC, the Court does not reach issues regarding the ALJ's finding at step 4 that N.N. is able to perform her past relevant work.

## IV. DISPOSITION

N.N. asks the Court to remand for payment of benefits under the credit-as-true doctrine. "An automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017). The Court may remand for an immediate award of benefits only where (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. at 1045. Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability. *Id*.

The credit-as-true standard is not satisfied here. There are further issues that must be resolved before a final determination can be made. As discussed above, on remand the ALJ

15

should consider whether excessive absenteeism is demonstrated for the period of time from the alleged onset of disability from June 1, 2004 through the August 1, 2005 period covered by Dr. Bains's certifications. Depending on what the ALJ finds on that issue, the ALJ should also consider the impact, if any, on N.N.'s contention that she is entitled to a disability "freeze."

## V. CONCLUSION

Based on the foregoing, N.N.'s motion for summary judgment is granted in part and denied in part, the Commissioner's motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order. The Clerk shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: September 30, 2021

*Virginia K. DeMarchi*
VIRGINIA K. DEMARCHI
United States Magistrate Judge